USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 2 0 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                             :

GUTHRIE HEALTHCARE SYSTEM,       :

                           :

         Plaintiff,          :        12 Civ. 7992 (KBF)

                           :

        -v-              :        OPINION & ORDER

                           :

CONTEXTMEDIA, INC. et al.,        :

                           :

        Defendants.      :

                           :

-------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

On October 26, 2012, Guthrie Healthcare System ("Guthrie") filed this trademark infringement action against ContextMedia, Inc. ("CMI"), and its president and chief executive officer ("CEO"), Rishi Shah. (Complaint, ECF No. 1; Trial Decl. of Rishi U. Shah ("Shah Decl.") ¶ 1, ECF No. 105.) Guthrie amended its complaint one year later to allege infringement of additional trademarks. (ECF No. 44.) The Amended Complaint asserts eight counts of federal trademark infringement pursuant to 15 U.S.C. § 1114 (Counts One through Eight); a claim of unfair competition under the Lanham Act, pursuant to 15 U.S.C. § 1125(a) (Count Nine); a claim of false designation of origin under the Lanham Act, pursuant to 15 U.S.C. § 1125(a) (Count Ten); common-law unfair competition (Count Eleven); federal trademark dilution under the Lanham Act, pursuant to 15 U.S.C. § 1125(c) (Count Twelve); and unjust enrichment (Count Thirteen).

On January 16, 2014, the Court partially granted and partially denied CMI's motion for summary judgment. ("SJ Op.," ECF No. 73.) The Court found that no triable issue of material fact existed as to actual consumer confusion, bad faith, or willful deception. (Id. at 13–18.) Accordingly, the Court found that monetary relief was unavailable to Guthrie under the Lanham Act, and disposed of Count Eleven, state-law unfair competition, which requires bad faith as an element. (Id. at 27, 29–31.) Guthrie voluntarily abandoned its dilution claim in Count Twelve. (ECF No. 51 at 1 n.1.) The Court's opinion left Counts One through Eight for copyright infringement, Count Nine for unfair competition, Count Ten for false designation of origin, and Count Thirteen for unjust enrichment to be resolved at trial. (SJ Op. 31.)

On January 31, 2014, the Court granted CMI's motion for partial reconsideration and dismissed Count Thirteen of the complaint related to unjust enrichment, with respect to CMI Marks One through Seven. (ECF No. 92.) Additionally, prior to trial, the Court severed Count Eight, regarding the trademark "ContextMedia Health," which CMI applied to register with the U.S. Patent and Trademark Office ("PTO") after this lawsuit had commenced. (See Trial Tr. 27, Feb. 20, 2014, ECF No. 113.) That trademark is the subject of Guthrie's pending motion for partial reconsideration. (ECF No. 85.)

The Court held a bench trial on February 5, 2014, on Counts One through Seven, Count Nine, and Count Ten. This Opinion & Order constitutes the Court's findings of fact and conclusions of law as to those counts.

2

For the reasons set forth below, the Court finds that there is a "likelihood of confusion" between Guthrie and CMI's trademarks that affects "numerous ordinary prudent purchasers" in Guthrie's service area—the Twin Tiers region of Northern Pennsylvania and Southern New York (the "Guthrie Service Area"). See Gruner + Jahr USA Publ'g, a Div. of Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993). However, the Court also finds that there is no likelihood of confusion, or that "numerous ordinary prudent purchasers" are unlikely to be confused, outside of the Guthrie Service Area. Accordingly, the Court awards limited injunctive relief, as described below, in the Guthrie Service Area.

I.  FINDINGS OF FACT

   A.  Guthrie's Operations

Guthrie is composed of Guthrie Healthcare, the Guthrie Clinic, and the Guthrie Foundation. (Decl. of Joseph A. Scopelliti ("Scopelliti Decl.") ¶ 6, ECF No. 100.) Guthrie operates 32 medical facilities, including three hospitals and 29 medical clinics. (Decl. of Mary Ann Dougherty ("Dougherty Decl.") ¶ 7, ECF No. 98.) Guthrie also operates a number of specialized healthcare facilities, including separate cardiology, cancer, dialysis, endocrine and bariatric, orthopedic, pediatric and same-day surgery centers, as well as an orthodontics clinic, a specialty eye-care and optometry business, and a fitness center. (Id. ¶¶ 7, 9.) In addition, Guthrie offers occupational health services to employers under contract. (Id. ¶ 11.) Guthrie's operations are in facilities located in the Twin Tiers Region of Northern Pennsylvania and Southern New York (the "Guthrie Service Area"). (See Tr. 88:6–

3

14, 114:10–115:16.)[1] Guthrie's medical practice is comprised of 280 physicians and 130 mid-level providers (physician assistants and nurse practitioners). (Scopelliti Decl. ¶ 9.) These physicians practice in 23 locations in southern New York and northern Pennsylvania. (Id. ¶ 9; Tr. 61:12–17.) Guthrie derives a substantial portion of its patient-care revenue from referrals from physicians and medical professionals. (Dougherty Decl. ¶ 10; Scopelliti Decl. ¶ 30.)

Guthrie focuses considerable marketing efforts on obtaining referrals from doctors and medical professionals. (Id. ¶ 31.) Securing referrals from physicians with whom Guthrie might otherwise compete is a delicate business, and Guthrie has made special efforts to make referring physicians comfortable in referring patients to Guthrie without fear that Guthrie will try to provide non-referred services to those patients. (Id. ¶ 32.)

Guthrie also has an extensive training program for clinical professionals, including training in nursing, residency programs for medical students, medical fellowships, and continuing medical education. (Id. ¶ 8.)

---

[1] Guthrie offers certain services to a wide geographic area, including its LEAP Testing Service. (Dougherty Decl. ¶ 16.) However, Guthrie did not present any evidence at trial regarding the consumers of such services and where such services are offered. The Court therefore finds no likelihood of consumer confusion in this larger geographic footprint. Similarly, Guthrie recruits physicians from areas throughout the United States (id. ¶ 17); however, apart from the fact that its trademark is used on information materials sent to potential recruits, Guthrie did not offer any evidence of likely consumer confusion as to this population. Guthrie also offers a variety of residency and educational programs for students across the country (id. ¶¶ 19–23); however, it offered no evidence as to where these students receive such education or any evidence as to how such students would likely be confused as between the CMI and Guthrie trademarks. Finally, Guthrie seeks donations from individuals located in various geographic areas outside of Pennsylvania and New York (id. ¶ 28); however, it offered no evidence that any of these populations would likely confuse the CMI and Guthrie marks. For instance, it did not show that donors outside of the Guthrie area ever saw or would see CMI's trademark.

4

The Guthrie Foundation conducts medical research. (Id. ¶ 39.) The Foundation also manages investigator-initiated trials and manages the Guthrie Institutional Review Board, which approves, monitors, and reviews research involving human experimentation. (Id. ¶ 40.) The Foundation further assists investigators in presenting their findings at various seminars and symposia. (Id. ¶ 41.) Funders of research are very sensitive to potential and actual conflicts of interest. (Tr. 71:18–72:07, 94:22–95:15, 96:10–18.) As a result, Guthrie takes very seriously the need to maintain independence from the sponsorship of brands or products, such as a particular type of branded pharmaceutical product. (Tr. 72:09–22.) Guthrie has a policy, to which it steadfastly adheres, to refuse to provide any endorsements or advertisements for third-party products or services so as to avoid any conflict, bias, or partiality, or the appearance of such. (Scopelliti Decl. ¶ 43.) Guthrie also insists that any medical information that it disseminates—whether over the Internet or in symposia, and whether to physicians and medical professionals or to patients and the public—meets evidence-based medical guidelines. (Id.)

B.    The Guthrie Mark

Guthrie launched its trademark and an associated new brand identity in September 2001. (Dougherty Decl. ¶ 34.) Monigle Associates developed the mark. (Scopelliti Decl. ¶ 16; Declaration of Michael Herburger ("Herburger Decl.") ¶¶ 6, 17, ECF No. 94.) The graphic, featuring a stylized human figure with arms upraised and in the center of a multi-colored shield, was intended to portray that Guthrie was putting the patient at the center of all things that Guthrie did and to suggest

heritage, strength and stability. (Id. ¶¶ 17, 19, 20.) The blue color in the shield was chosen to represent strength and stability, and the orange and yellow represented warmth and a human quality. (Id. ¶ 20.)

At the time that Monigle designed the Guthrie Mark, other trademarks in existence used stylized human figures and other trademarks used shields; however, to Monigle's senior creative director Michael Herburger's knowledge, no other trademark featured a stylized human figure superimposed on a shield segmented into four sections. (Id. ¶¶ 21–22.) Monigle also prepared, and Guthrie deployed and has adhered to, documents called "Guidelines for Signature Use," "Design System Guidelines," and "Design System Development" to assist Guthrie in its launch of and to control the use of its trademark. (Id. ¶¶ 26–28; Scopelliti Decl. ¶¶ 18, 21.)

On January 22, 2008, the PTO registered U.S. Trademark Registration No. 3,374,204 (the "Guthrie Mark"), which specified coverage for "medical services, namely, hospital, emergency room, nursing home, home infusion, hospice and home health care and nursing services." (PX-012.) On February 13, 2013, the PTO acknowledged Guthrie's filing of a Declaration of Incontestability for the Guthrie Mark. (Dougherty Decl. ¶ 67.)

The Guthrie Mark has both textual and graphic components:



Guthrie has invested substantial sums in promoting the Guthrie Mark, and regularly uses it as a primary identifier of its health system, including on signage,

in advertising, on its websites www.guthrie.org and www.ichooseguthrie.org, and the like. (Dougherty Decl. ¶¶ 37–38, 40–43, 50–52; Scopelliti Decl. ¶ 20.) The Guthrie website is a branded portal that delivers a variety of information to patients and potential patients, as well as other customers, employees, students, research partners, donors, and the community. (Id. ¶ 33.) The website provides access to on-demand health-related content regarding a variety of medical conditions and issues; patients can also use the website to check on or schedule appointments. (Id. ¶ 34.)

Beginning in 2001, Guthrie ran television advertising prominently displaying the Guthrie Mark in its Service Area. (Dougherty Decl. ¶¶ 44–45.) Guthrie has also partnered with local television stations to produce health-related features that feature the Guthrie Mark. (Id. ¶ 46.) From July 1, 2008 to June 30, 2013, Guthrie spent $7,250,000 promoting the Guthrie Mark and brand, of which approximately $5,400,000 was spent on advertising featuring the Guthrie Mark. (Id. ¶¶ 56–57.)

Guthrie has a nascent program that it refers to generically as "digital signage." (Scopelliti Decl. ¶ 37.) This program is designed to "push" or disseminate health-related content onto video screens at Guthrie facilities. (Dougherty Decl. ¶¶ 62–63; Scopelliti Decl. ¶ 37.) At this point, the program (started in 2010) is not robust and is not likely to become particularly robust in the near term; it has been deployed on two video screens at two Guthrie facilities. (Dougherty Decl. ¶ 65; Scopelliti Decl. ¶ 37; Tr. 57:19–23.) The program was included in the fiscal year 2013 and fiscal year 2014 budget requests, but only as a line item and without a

7

developed business plan or programming behind it. (Dougherty Decl. ¶ 64; see Tr. 56:14–57:12, 121:11–124:08, 135:23–137:05, 142:12–143:23.)

C. CMI's Operations

Rishi Shah, Shradha Agarwal, and Derek Moeller founded CMI in 2006. (Declaration of Rishi U. Shah ("Shah Decl.") ¶ 1, ECF No. 105.) Shah is CMI's president and CEO and one of its directors. (Id.) CMI has offices in Chicago and New York City, and employs 42 people. (Id.)

CMI's business is delivering educational, health-related content to physician practices; it derives its revenue from selling advertising that accompanies the content. (Id. ¶ 2.) CMI owns and operates a series of digital healthcare platforms delivering condition-specific educational programming to patients at waiting areas and in some cases to treatment rooms or physicians' offices. (Id.) In almost all cases, CMI derives its revenue through advertisements periodically displayed between segments of programming. (Id.) The physicians therefore do not generally pay anything to have the service in their office. (Id.) A very small percentage of physicians chooses to pay for the service and does not receive advertisements. (Id.)

CMI's primary advertisers, referred to as "sponsors," are sophisticated companies that market pharmaceutical and other healthcare products and/or services—mostly large pharmaceutical companies. (Id. ¶¶ 2, 6.) CMI's competitors for similar services are PatientPoint (formerly Health Advice), Health Monitor Network, Health Media Network, Health Focus Media, and Accent Health. (Id. ¶ 2.) CMI's direct customers are the companies who purchase advertising on its service and the medical providers with whom CMI contracts to deploy its service.

(See id.) The target audience for the advertisers and physicians are the patients or others who are in the waiting or treatment areas where CMI's service is aired.

CMI licenses a large collection of digital educational content related to health and wellness. (Id. ¶ 3.) The videos are generally short segments that focus on easy-to-implement lifestyle changes, including nutrition and exercise tips. (Id.) Some other videos are in-depth features on specific conditions. (Id.) CMI licenses content from organizations such as the American Heart Association, the American Dietetic Association, the Academy of Nutrition and Dietetics, the Juvenile Diabetes Research Foundation, Health Day TV, and D Life. (Id.)

CMI displays its programming on flat-panel display units, media players, and other hardware in physician's offices. (Id.) It delivers new content on approximately a monthly basis. (Id. ¶ 4.)

CMI has two websites. The first, www.contextmediahealth.com, is aimed at its member physician offices; the second, www.contextmediainc.com, is aimed at potential sponsors, prospective employees, and the media. (Id. ¶ 10.) CMI does not offer its service over the Internet to be viewed, for instance, in a patient's home.

The CMI screen, as seen by the viewer, is divided into three parts: a sidebar on the left side of the screen, a main content window to the right of the sidebar, and a news ticker (a line of text that scrolls across the bottom of the screen). (Id. ¶ 11.) CMI's marks regularly appear in the sidebar; they do not appear in the news ticker, and they may appear from time to time in the background of the main window. (Shah Decl. ¶¶ 13–14; see, e.g., PX-159, at 11:24–12:13, PX-160, at 12:07–12:57.)

9

The educational content, which fills the main content window when it appears, are not advertisements, "advertorials," or "infomercials," but are independently produced. (Shah Decl. ¶ 15.) Although CMI licenses most of its video content, it has also worked with third parties to produce certain of its own video content. (Id.; Tr. 165:12–22.)

Shah had not heard of the Guthrie Healthcare System, nor was he aware of the Guthrie Mark, until early 2012. (Shah Decl. ¶ 23.)

D.    CMI's Eight Trademarks

CMI has adopted a number of trademarks in connection with its business. A graphic artist, Anthony Bonilla, created artwork that CMI used in its marks in late 2007 and early 2008.

On or about March 10, 2009, more than a year after Guthrie received its registered trademark, the PTO registered the following trademark as U.S. Registered Trademark No. 3,625,528 ("CMI Mark 1"):



On January 5, 2010, the PTO registered the following trademark as U.S. Registered Trademark No. 3,734,197 ("CMI Mark 2"):



On December 6, 2011, the PTO registered the following trademark as U.S.

Registered Trademark No. 4,065,913 ("CMI Mark 3"):



On or about June 16, 2011, CMI filed an Intent to Use Trademark

Application to register the following mark ("CMI Mark 4"):



The application to register CMI Mark 4 is pending.

On or about October 6, 2011, CMI filed Intent to Use Trademark Applications

to register the following marks ("CMI Mark 5," "CMI Mark 6," and "CMI Mark 7"):







The applications to register CMI Marks 5–7 are pending. On August 16, 2013—ten months after this litigation began—CMI filed an Intent to Use Trademark Application to register the following mark ("CMI Mark 8"):



In February 2014, CMI ceased engaging in new uses of CMI Marks 1–7; however, its products already in commerce continue to use those marks. CMI has rebranded itself as ContextMedia Health, and intends to use CMI Mark 8 as its primary mark going forward.

CMI's marks appear with both the graphic and text; one does not typically appear without the other. (Tr. 78:12–79:15.)[2]

Side-by-side, the Guthrie Mark and CMI Mark 2 appear as follows:



E.  The Origin of This Lawsuit

In December 2011, Guthrie received a holiday card from CMI, which displayed CMI Mark 1. (Dougherty Decl. ¶¶ 68–69.) Mary Ann Dougherty, the director of strategic planning and marketing of Guthrie, believed that the graphic elements of the CMI mark and the Guthrie Mark were "very, very similar." (Id. ¶ 69.) On January 3, 2012, Dougherty contacted CMI and stated her belief that it

---

[2] At times, the shield graphic is animated, distorted, or in motion, and the text appears after the shield. In such instances, there may be moments when the graphic temporarily appears alone, not affixed to the text. (Shah Decl. ¶ 18; see, e.g., DX-15, at 20:09; DX-39, at 29:02, 29:10.)

was "duplicating" the Guthrie Mark. (Id. ¶ 70.) She followed up with a letter on February 1, 2012, demanding that CMI cease using any use of Guthrie's image that depicted a "figure within a shield of multicolored compartments." (Id. ¶ 71.) Dougherty did not receive a reply to either communication. (Id. ¶ 72.)

## II.   CONCLUSIONS OF LAW

### A.   Trademark Infringement (Counts One Through Seven)

To prevail on its claims of trademark infringement under 15 U.S.C. § 1114 (Counts One through Seven), Guthrie must demonstrate "that it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." Gruner + Jahr, 991 F.2d at 1075. A "likelihood of confusion" means that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." Id. at 1077.

"A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999). Guthrie has a valid registration for its mark, "so the issue for determination is whether [Guthrie] has demonstrated a likelihood of confusion, and we are guided in this inquiry by the Polaroid balancing test." Sports Auth., Inc. v. Prime Hospitality, Inc., 89 F.3d 955, 960 (2d Cir. 1996).

### 1. The Polaroid factors

The "Polaroid factors" were first set out by Judge Friendly in <u>Polaroid Corp.</u> <u>v. Polarad Electronics Corp.</u>, 287 F.2d 492 (2d Cir.), <u>cert. denied</u>, 368 U.S. 820 (1961). The Second Circuit has reaffirmed their applicability in trademark cases. <u>See, e.g.</u>, <u>Time, Inc. v. Petersen Pub. Co.</u>, 173 F.3d 113, 117 (2d Cir. 1999). Those eight factors are: "(1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will 'bridge the gap' . . . ; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers." <u>Arrow Fastener Co. v. Stanley Works</u>, 59 F.3d 384, 391 (2d Cir. 1995) (citing <u>Polaroid</u>, 287 F.2d at 495).

No one of the <u>Polaroid</u> factors is dispositive; rather, the question for the court is, after weighing all of the factors, whether consumers are likely to be confused. <u>See</u> <u>Natural Organics, Inc. v. Nutraceutical Corp.</u>, 426 F.3d 576, 579 (2d Cir. 2005). Guthrie must prove "a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers." <u>Star Indus., Inc. v. Bacardi & Co. Ltd.</u>, 412 F.3d 373, 383 (2d Cir. 2005) (internal quotation marks omitted).

#### (a) Strength of the mark

The first <u>Polaroid</u> factor, the strength of the mark, "refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source." <u>Streetwise Maps, Inc. v. Vandam, Inc.</u>, 159 F.3d 739, 743 (2d Cir. 1998); <u>see also</u> <u>Cadbury Beverages, Inc. v. Cott Corp.</u>, 73 F.3d

14

474, 479 (2d Cir. 1996). "To gauge a mark's strength, we consider two factors: its inherent distinctiveness, and its distinctiveness in the marketplace." Streetwise, 159 F.3d at 743.

Courts classify marks into one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, or arbitrary and fanciful. See Sports Auth., 89 F.3d at 961. The classification of a trademark is an issue of law. See Bernard v. Commerce Drug Co., 964 F.2d 1338, 1340–42 (2d Cir. 1992). The Second Circuit has set forth the four categories of distinctiveness as follows:

> A common name, available to anyone, is never entitled to trademark protection. At the opposite end of the distinctiveness array is an arbitrary or a fanciful term. . . . An arbitrary term is one that has a dictionary meaning—though not describing the product—like IVORY for soap. A fanciful mark is a name that is made-up to identify the trademark owner's product like EXXON for oil products and KODAK for photography products. . . .
>
> A suggestive mark . . . suggests the product, though it may take imagination to grasp the nature of the product. An example is ORANGE CRUSH, an orange-flavored beverage. . . .
>
> [A descriptive] mark . . . tells something about a product, its qualities, ingredients or characteristics. It may point to a product's intended purpose, its function or intended use, its size, or its merit.

Gruner + Jahr, 991 F.2d at 1075–76.

In considering this factor, a court may weigh certain components of the mark separately from the mark as a whole in determining the distinctiveness of the overall mark. See, e.g., Streetwise, 159 F.3d at 744 ("[T]hird party use of the words "street" and "wise" weakens the strength of Streetwise's mark."); Time, 173 F.3d at 118 ("The use of part or all of the mark by third parties weakens its overall strength."); Lang v. Ret. Living Pub. Co., 949 F.2d 576, 581 (2d Cir. 1991)

("[E]xtensive third party use of the words "Choice" and "Choices" weighs against a finding that [the name "New Choices Press"] is strong."). However, it is also "the general rule that one may not avoid a likelihood of confusion by the addition [to the senior user's mark] of descriptive or otherwise subordinate matter." U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 529 (S.D.N.Y. 2011) (alteration in original) (internal quotation marks omitted) (quoting Bellbrook Diaries Inc. v. Hawthorn-Mellody Farms Dairy, Inc., 253 F.2d 431, 432 (C.C.P.A. 1958)); see also A.T. Cross Co. v. Jonathan Bradley Pens, Inc., 470 F.2d 689, 692 (2d Cir. 1972).

The Court finds that this factor favors Guthrie. "[R]egistered trademarks," such the Guthrie Mark, "are presumed to be distinctive and should be afforded the utmost protection." Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986). Additionally, the name "Guthrie" is "fanciful—that is, it is a term without any dictionary meaning." Cadbury, 73 F.3d at 479. The stylized human figure inside a shield is also distinctive. While Herburger testified that the graphic, including its colors, was intended to suggest Guthrie's values of heritage, strength and stability (Herburger Decl. ¶¶ 17, 19, 20), the graphic is neither descriptive nor suggestive of Guthrie's product—medical facilities. Guthrie's use of its mark since 2001 (Dougherty Decl. ¶ 34), its advertisements using the mark (id. ¶¶ 44–46, 56–57), and its use of guidelines for the proper use of the mark (Herburger Decl. ¶¶ 26–28; Scopelliti Decl. ¶¶ 18, 21) further bolster the strength of the Guthrie Mark. See Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.,

182 F.3d 133, 139 (2d Cir. 1999) (explaining that "evidence of advertising can bolster a mark's strength"); <u>Life Indus. Corp. v. Star Brite Distributing, Inc.</u>, 31 F.3d 42, 46 (2d Cir. 1994) (explaining that a "long-used" trade dress was strong); <u>Calvin Klein Jeanswear Co. v. Tunnel Trading</u>, No. 98 Civ. 5408 (THK), 2001 WL 1456577, at *8 (S.D.N.Y. Nov. 16, 2001) (Plaintiff enhances the strength of its marks by, <u>inter alia</u>, maintaining various quality controls . . . .").

However, other factors weigh against the strength of the Guthrie Mark. For example, Herburger testified that the components of the mark's graphic element—a shield and a human figure—have been used in other logos in the healthcare field. (Tr. 77:02–15.) <u>See</u> <u>Time</u>, 173 F.3d at 118 ("The use of part or all of the mark by third parties weakens its overall strength."). Additionally, the strength of the Guthrie Mark with respect to customers of the services for which it is registered— "medical services, namely, hospital, emergency room, nursing home, home infusion, hospice and home health care and nursing services" (PX-012)—does not necessarily increase the mark's strength with respect to purveyors of health-related digital educational content. <u>See</u> <u>Savin Corp. v. Savin Grp.</u>, 391 F.3d 439 (2d Cir. 2004) ("[E]ven if a mark is registered and, thus, afforded the utmost degree of protection, the presumption of an exclusive right to use the mark extends only so far as the goods or services noted in the registration certificate.") (citations omitted). Furthermore, while Guthrie has proffered evidence concerning the length of its use and its marketing and advertising expenses (Dougherty Decl. ¶¶ 34, 44–46, 56–57), it has not provided specific evidence confirming that the relevant consumers

17

recognize its mark. See Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 132 (2d Cir. 2004) ("[T]o achieve the status of a strong mark, plaintiff must demonstrate distinctiveness in the relevant market . . . .").

Nonetheless, the fact that the mark is registered and the distinctiveness of both its graphic and its text components tip this factor in favor of Guthrie.

### (b)     Similarity between the marks

"When evaluating the similarity of marks, courts consider the overall impression created by a mark. Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar." Id. at 133. "The law does not require that trademarks be carefully analyzed and dissected by the purchasing public"; the proper focus is on the "general impression conveyed by the two marks." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1134 (2d Cir. 1979), superseded by rule on other grounds as stated in Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 406 (2d Cir. 2004); see also Lebewohl v. Heart Attack Grill LLC, 890 F. Supp. 2d 278, 294 (S.D.N.Y. 2012) ("If the appearance of the marks is similar enough that it may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark, there may still be similarity.") (internal quotation marks omitted).

The Court finds that the high degree of similarity between the graphic portions of the marks weighs in favor of Guthrie. Both marks feature a stylized human figure superimposed on a shield segmented into four sections and use a

similar color scheme. See Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 106 (2d Cir. 2009) (considering similarities and differences in "imagery, color, and format"). Furthermore, the graphic element of the CMI Marks is dominant. CMI Mark 1 does not include CMI's trade name, and CMI Marks 3–7 merely refer to a "ContextMedia service" in a smaller typeface. CMI also disclaims the use of text in certain of its marks (e.g., PX-098 (disclaiming the use of the phrase "diabetes health network" in CMI Mark 1); PX-104 (same for "rheumatoid health network")),[3] thus increasing the dominance of the graphic element. See In re Dixie Restaurants, Inc., 105 F.3d 1405, 1407 (Fed. Cir. 1997). The display of the shield graphic alone in certain videos, even temporarily, further confirms that the graphic portion is dominant. (See, e.g., PX-159, at 11:24–12:13; PX-160, at 12:07–12:57; DX-15, at 20:09; DX-39, at 29:02, 29:10.)[4]

The high degree of similarity of the graphic portions therefore weighs in favor of Guthrie. See Kangol Ltd. v. Kangaroos U.S.A., Inc., 974 F.2d 161, 163 (Fed. Cir. 1992). Even if the shield image were not the dominant portion of Guthrie's mark, "[i]t is enough that an ordinary consumer could interpret the similar marks as indicating that the products derive from the same source." Perfect Pearl Co. v. Majestic Pearl & Stone, Inc., 887 F. Supp. 2d 519, 536 (S.D.N.Y. 2012).

---

[3] CMI did not disclaim the right to use the text "A CONTEXTMEDIA SERVICE," which appears in CMI Marks 3–7.
[4] Herburger further testified that the shield graphic "is the dominant element of the Guthrie Trademark." (Herburger Decl. ¶ 23.) CMI objected to this statement as conclusory, improper lay opinion testimony, and an improper opinion on a legal conclusion. The Court overruled those objections and ruled that the statement was a lay opinion or a statement of belief subject to whatever weight the Court determined to give it. Nonetheless, the Court would find the shield to be the dominant element of the Guthrie Mark even without Herburger's testimony.

CMI focuses on the text elements of the Guthrie and CMI Marks, which decrease the Marks' similarity through their use of different typefaces and capitalizations and their use of the parties' names. It is true that "the presence of a distinct brand name," as here, "may weigh against a finding of confusing similarity." Playtex Prods., Inc. v. Georgia-Pac. Corp., 390 F.3d 158, 164 (2d Cir. 2004), superseded on other grounds by statute as recognized in Starbucks, 588 F.3d at 108; see also W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993) ("[W]hen a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened."), superseded on other grounds by Deere & Co. v. MTD Prods, Inc., 41 F.3d 39 (2d Cir. 1994); Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1046 (2d Cir. 1992) ("[T]he prominent presence of well known trade names goes far toward countering any suggestion of consumer confusion."). The typefaces and distinctiveness of the corporate names are also relevant considerations. Grotrian, Helfferich, Schultz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1339–40 (2d Cir. 1975). Furthermore, Herburger testified that the Guthrie logo was "designed to display the Guthrie name in a bold and effective way"—emphasizing the part of the marks that is dissimilar—and Dougherty testified that Guthrie always uses its mark with the text element, which reduces their similarity. (Tr. 78:12–20; 116:20–22.)

These arguments are ultimately unavailing. The Court must "consider the overall impression created by a mark. Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding

whether the compared marks are confusingly similar." Brennan's, 360 F.3d at 133. Here, the text portion of the CMI Marks is often significantly smaller than the graphic portion (see CMI Marks 3–7), and the text is at times divorced from CMI's mark.[5] A cursory visual inspection of Guthrie and the CMI Marks, even including the text, indicates the striking similarity of these marks. Considering the "overall impression created by [the] mark," the Court finds that these marks are indeed "confusingly similar" to the consumer. Brennan's, 360 F.3d at 133.

(c)    Proximity of the products

"The proximity inquiry asks to what extent the two products compete with each other. In assessing product proximity we look at the nature of the products themselves and the structure of the relevant market." Id. at 134 (citations omitted). Among the relevant considerations "are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." Cadbury, 73 F.3d at 480; W.W.W. Pharm., 984 F.2d at 573 ("[T]he court may consider whether the products differ in content, geographic distribution, market position, and audience appeal."). The proximity "factor has two elements, market proximity and geographic proximity. Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both

---

[5] Whether CMI uses the graphic element without text "for visual effect" or "for source of identification" is insignificant to this inquiry. (See Defs.' Post-Trial Mem. 5, ECF No. 115.) The question is whether the "overall impression" to a consumer is one of similarity. See Brennan's, 360 F.3d at 133.

elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." Brennan's, 360 F.3d at 134.

The Court finds that this factor favors Guthrie as to its business within the Guthrie Service Area. Guthrie's major business operations (versus recruiting and fundraising) are limited to its Service Area. It delivers medical and healthcare services via facilities located in its Service Area to patients of such facilities and their families, as well as students of its training and residency programs. (Dougherty Decl. ¶¶ 7, 9; Scopelliti Decl. ¶ 8; Tr. 90:09–11, 90:25–91:05.) CMI, on the other hand, has a nationwide business. It delivers educational health-related content to waiting rooms of physician practices and clinics; its revenues derive from sales of advertising content played during "commercial breaks" in the otherwise more educational content. (Shah Decl. ¶ 2) CMI's video content focuses on various health concerns that are among those treated by that physicians practicing at Guthrie facilities (e.g., diabetes, cardiology, and cancer).

The similarity of the graphic portion of the Guthrie and CMI Marks is likely to confuse members of the public (patients). It is possible that a Guthrie patient viewing a CMI video could conclude that Guthrie sponsors or approves of CMI's videos or the products and services advertised in those videos. See, e.g., McGregor-Doniger, 599 F.2d at 1134 (explaining that "the degree of proximity between the two products . . . bears on the likelihood that customers may be confused as to the Source of the products, rather than as to the products themselves") (emphasis added). Additionally, the companies both operate in the Guthrie Service Area. See

22

Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 218 (2d Cir. 2003) (explaining that the companies' "sale locations are geographically close").

The Court is mindful that the companies' products, markets, and services are not identical and do not compete directly. For example, Guthrie has a policy of not endorsing or advertising third-party products or services, and, while Guthrie has a nascent video effort of its own, it does not currently display videos on those screens. (Decl. of Lynn Yaeger ("Yaeger Decl.") ¶ 28, ECF No. 96; Scopelliti Decl. ¶ 43; Tr. 97:05–08, 123:03–20; DX-300.)[6]

However, these facts are not dispositive, and understate the obvious proximity. See Arrow, 59 F.3d at 396 (explaining that a lack of direct competition between products is not dispositive); Lois, 799 F.2d at 871. Both companies operate in the healthcare field more generally, and Guthrie's clients (patients and families in its waiting rooms) are CMI's viewing audience. It is certainly possible—and indeed likely—that a client sitting in a Guthrie waiting room to meet with a physician regarding his or her diabetes could be exposed to CMI video content relating to diabetes. When the evidence is viewed holistically, the proximity factor favors Guthrie. Accordingly, the Guthrie and CMI business are proximate as a matter of fact and law. See, e.g., Cadbury, 73 F.3d at 480.

### (d)     The likelihood of bridging the gap

This factor concerns the likelihood that Guthrie will enter the same business as CMI. See Cadbury, 73 F.3d at 482. "This factor is designed to protect the senior

---

[6] The Court notes that Guthrie does have more robust health-related content on its own website accessible to the public, and patients may use that website to view content regarding medical issues. (Scopelliti Decl. ¶ 34.)

user's interest in being able to enter a related field at some future time." <u>Savin</u>, 391 F.3d at 459–60 (internal quotation marks omitted).

The Court finds that this factor weighs in favor of CMI. It is certainly true that Guthrie currently produces health-related videos that are available on its website and that are comparable to certain of CMI's video content. (<u>Compare, e.g.</u>, PX-081 (a "Health Matters" television spot regarding Guthrie's weight-loss treatments) <u>with</u> PX-156 (an "Ask Amy" informative clip regarding controlling diabetes through carbohydrate counting).) Guthrie has also deployed its digital signage program on two video screens at Guthrie facilities, and has requested funding to expand the program to 14 screens. (Dougherty Decl. ¶ 65; Scopelliti Decl. ¶ 37; Tr. 57:19–23, 121:11–122:25.)

However, Guthrie's plans are too speculative and vague to prove its intent to bridge the gap. Guthrie refuses to endorse or advertise third-party products or services—the business through which CMI derives revenue. (Yaeger Decl. ¶ 28; Scopelliti Decl. ¶ 43; Tr. 97:05–08.) Additionally, no screens have been approved for Guthrie's digital signage program in the past two or three years; no detailed marketing plans exist for the project; no implementation or development of content has taken place; no video content is planned for display on these screens; no advertising is planned for these screens; no screens have been deployed since March 2011; and no screens will be deployed in third-party facilities. (Tr. 58:09–12, 121:11–21, 122:03–05, 122:18–25, 124:01–08, 136:04–17, 137:02–06, 142:12–143:23.) The Court is mindful that "the absence of a present intent to bridge the gap is not

24

determinative," and that "the assumptions of the typical consumer, whether or not they match reality, must be taken into account." McGregor-Doniger, 599 F.2d at 1136. However, given the lack of development of the digital signage program and the vagueness of Guthrie's plans, a typical consumer is unlikely to assume that Guthrie will move into CMI's market.

(e)    Actual confusion

As the Court found on summary judgment, there is no evidence of actual consumer confusion between the Guthrie and CMI Marks. (SJ Op. 13–15.) Guthrie has admitted that it is not aware of any actual consumer confusion, and has presented no consumer survey evidence to show confusion. (Id. at 13–14.) See Starbucks, 588 F.3d at 117; Star, 412 F.3d at 388. Guthrie did not adduce evidence of actual confusion at trial.

CMI argues that the lack of evidence of actual consumer confusion is especially significant in this case because it exists in the face of the parties' longstanding simultaneous use of their respective marks and the fact that both parties interact with pharmaceutical companies, physicians, and patients. (See Decl. of Laura Fitzgerald ("Fitzgerald Decl.") ¶¶ 11–13, ECF No. 97; Dougherty Decl. ¶ 34.) The Court finds a likelihood of confusion between the Guthrie and CMI Marks notwithstanding those facts. The "absence of actual confusion alone is not dispositive of the question of likelihood of confusion," even in this situation. Arrow, 59 F.3d at 397; see Lois, 799 F.2d at 875 (finding a likelihood of confusion despite methodologically flawed evidence of actual confusion). Consideration of the

Polaroid factors as a whole against the record evidence demonstrates that confusion is indeed likely in the Guthrie Service Area.

### (f) Defendant's good faith

As the Court found on summary judgment, there is no evidence that CMI acted in bad faith in adopting CMI Marks 1 through 7. (SJ Op. 15–17.) Guthrie has proffered no evidence showing that CMI adopted those marks "with the intent to sow confusion between the two companies' products." Star, 412 F.3d at 388. In reaching this conclusion, the Court was persuaded in part by the fact that CMI, Bonilla, and Shah adopted the CMI Marks and applied to register them without any prior knowledge of Guthrie. However, CMI applied to register CMI Mark 8, for "ContextMedia Health," on August 16, 2013, after this litigation had commenced—a fact that warrants further inquiry into CMI's good faith with respect Mark 8. Therefore, the Court has severed that mark for further consideration, as set forth infra.

### (g) Quality of the defendant's product

"Essentially, there are two issues with regard to quality, but only one has relevance to determining the likelihood of confusion. If the quality of the junior user's product is low relative to the senior user's, then this increases the chance of actual injury where there is confusion, i.e., through dilution of the senior user's brand. A marked difference in quality, however, actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the

lesser-quality products of the junior user. Conversely, where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of dilution." Savin, 39 F.3d at 461.

The Court finds that this factor is neutral. Guthrie requires that the health-related information that it disseminates satisfies evidence-based medical guidelines. (Scopelliti Decl. ¶ 43.) CMI's policy is only to license content from organizations that have content-review processes. (Tr. 165:23–166:14, 167:18–168:01, 168:13–169:14, 170:07–23.) Shah also testified that CMI could change advertisements and content at any time, though not without certain difficulties and costs; indeed, CMI has altered preexisting videos in a limited manner to superimpose its new logo on existing content. (Tr. 209:11–13, 209:14–18, 213:11–15, 21:24–215:02.) Based on the limited evidence adduced at trial, the Court does not find either a similarity or difference in quality that materially affects the likelihood of confusion here.

### (h)  Sophistication of the buyers

"Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1046 (2d Cir. 1992). In assessing this factor, the Court "must consider [t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market

and giving the attention such purchasers usually give in buying that class of goods."
Sports Auth., 89 F.3d at 965 (alteration in original).

The Court finds that this factor favors Guthrie. CMI argues that pharmaceutical companies and other parties who conduct clinical trials with Guthrie are likely to be sophisticated parties. (See Fitzgerald Decl. ¶ 11; Tr. 60:15–61:22, 94:01–13.) However, Guthrie's direct customers—visitors to Guthrie's healthcare facilities—will have widely varying levels of sophistication. It is true that Guthrie's patients likely take considerable care in choosing a physician or hospital (see Tr. 51:14–17), but that does not make them sophisticated regarding the evaluation of video content or distinguishing between distributors of health-related video content in the waiting room and the owners of that waiting room. CMI argues that its direct consumers—typically pharmaceutical companies who pay CMI to sponsor its content—are highly sophisticated, because of the lengthy process that CMI undertakes to sign up a new consumer. (See Shah Decl. ¶ 6–9.) Again, however, consumers of health-related information or products advertised in CMI's videos—who are also relevant to this analysis, because they consume the products of the sponsors that fund CMI's content—are likely to be quite varied, as humans are. Thus, this factor favors Guthrie. See, e.g., Sports Auth., 89 F.3d at 965.

2.    Balancing

Balancing all of the Polaroid factors, the Court finds that confusion is likely in the Guthrie Service Area. Four factors (strength, similarity, proximity, and sophistication) favor Guthrie; three factors (bridging the gap, actual confusion, and

good faith) favor CMI; and one factor (quality) is neutral. As a result, the Court finds that CMI has infringed Guthrie's trademark. The Court shall enter an injunction as specified further below. See, e.g., Home Box Office, Inc. v. Showtime/The Movie Channel Inc., 832 F.2d 1311, 1315 (2d Cir. 1987) (explaining that an injunction was a "proper remedy" where there was a likelihood of confusion).

The Court does not make a finding regarding CMI's infringement with respect to CMI Mark 8, which CMI adopted after this litigation had commenced. The parties shall make appropriate arguments regarding CMI Mark 8 as set forth below.

B.    Shah's Individual Liability for Trademark Infringement

Courts in the Second Circuit have found a corporate officer to be personally liable for the trademark infringement of the corporation if he or she was a "moving, active, conscious force behind [the defendant corporation's] infringement." Cartier v. Aaron Faber, Inc., 512 F. Supp. 2d 165, 170 (S.D.N.Y. 2007). Courts have found such a situation to exist "where the defendant admitted to wielding or was proven to wield a great deal of discretionary authority within the corporation, either by virtue of being the sole employee of the corporation or as an officer with substantial decision making power." Eu Yan Sang Int'l Ltd. v. S & M Enters. (U.S.A.) Enter. Corp., No. 09 Civ. 4235 (RRM) (RER), 2010 WL 3824129, at *2 (E.D.N.Y. Sept. 8, 2010).

With respect to Counts One through Seven, the Court finds that defendant Shah, the president and CEO of CMI and one of its directors, is not individually

liable for CMI's infringement. CMI has offices in both Chicago and New York City, and employs 42 people, including several officers other than Shah. (Shah Decl. ¶ 1; Tr. 147:07–10.) CMI broadcasts its videos to a broader audience than the Guthrie Service Area, the Twin Tiers region of Northern Pennsylvania and Southern New York. While Shah is the president and CEO of CMI, he resides in Chicago and operates out of the Chicago office; a different officer, Shradha Agarwal, was in charge of opening the New York office. (Shah Decl. ¶ 1; Tr. 149:03–05.) Under such circumstances, there is no reason to hold Shah individually liable.

By contrast, the cases in which courts have held individual officers to be liable have generally involved some element of willful infringement, bad faith, or counterfeiting. See, e.g., Eu Yan Sang, 2010 WL 3824129, at *4 (willful infringement); Johnson & Johnson Consumer Cos. v. Aini, 540 F. Supp. 2d 374, 391 (E.D.N.Y. 2008) (bad faith); Cartier, 512 F. Supp. 2d at 168 (counterfeits); Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 902 (E.D.N.Y. 1988) (counterfeits). Those factors are not present here. The trial record contains no facts to disturb the Court's summary judgment determination that no reasonable juror could find willful infringement or bad faith in these circumstances.

The Court does not make a finding regarding Shah's liability with respect to CMI Mark 8, which CMI adopted after this litigation had commenced. The parties shall make appropriate arguments regarding CMI Mark 8 as set forth below.

C.    Unfair Competition and False Designation (Counts Nine and Ten)

"[I]t is well settled that the standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for

trademark infringement claims under Section 32 (15 U.S.C. § 1114)." Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002) (citing Lois, 799 F.2d at 871); see also Thompson Medical Co. v. Pfizer Inc., 753 F.2d 208, 213 (2d Cir. 1985) ("The ultimate inquiry in most actions for false designation of origin, as with actions for trademark infringement, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.") (alteration in original) (internal quotation marks omitted).

Accordingly, the Court finds for Guthrie on Count Ten (false designation of origin) with respect to CMI Marks 1 through 7.

Guthrie also alleges a separate cause of action for unfair competition under the Lanham Act (Count Nine). The standard for unfair competition claims is the same as for trademark infringement and false designation under the Lanham Act. See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 61–62 (2d Cir. 2000) (analyzing, for purposes of an unfair competition claim under the Lanham Act, the "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question" through the eight-factor Polaroid test); Forschner Grp., Inc. v. Arrow Trading Co., 124 F.3d 402, 407 (2d Cir. 1997) (setting forth the standard for unfair competition under the Lanham Act); see also 5 McCarthy on Trademarks and Unfair Competition § 27:9 (4th ed. 2009) (discussing the "two major and distinct

types of unfair competition: (1) infringement of even unregistered marks, names and trade dress, and (2) false advertising") (internal quotation marks omitted).

Accordingly, the Court finds for Guthrie on Count Nine (unfair competition) with respect to CMI Marks 1 through 7.

D.    Nature and Scope of Injunction

Injunctive relief is a proper remedy for violations of the Lanham Act under appropriate circumstances. See, e.g., Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 163 (2d Cir. 2007); Home Box Office, 832 F.2d at 1315.

A "plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

The Court finds that all four factors have been met here. In a trademark case, "proof of a likelihood of confusion . . . create[s] a presumption of irreparable harm, and thus a plaintiff [does] not need to prove such harm independently." Fed. Express Corp. v. Fed. Espresso, Inc., 201 F.3d 168, 174 (2d Cir. 2000). As set forth above, a likelihood of confusion between the Guthrie and CMI Marks exists in the Guthrie Service Area, due to which the public may be confused as to, inter alia, the source of CMI's health-related video content, the relationship between CMI's sponsors and Guthrie, or the owner of Guthrie's facilities. Accordingly, the Court

32

may presume irreparable harm. See id. at 174. As set forth above, monetary damages are unavailable in this case due to the lack of showing of bad faith, willful infringement, or actual confusion. The Court also finds, for the same reasons underlying its finding of irreparable harm, that the balance of hardships and the public interest weigh in favor of a limited injunction to ensure that any consumer confusion is limited or eliminated. See Forschner, 124 F.3d at 407 (discussing the public policies and interests underlying trademark and competition law).

"Injunctive relief should be narrowly tailored to fit specific legal violations. Accordingly, an injunction should not impose unnecessary burdens on lawful activity." Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994) (citation omitted). "In fashioning the injunction, the Court should balanc[e] . . . the equities to reach an appropriate result protective of the interests of both parties." Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 747 (2d Cir. 1994) (alterations in original) (internal quotation marks omitted).

The Court shall enter a permanent injunction as follows: CMI shall be prohibited prospectively from using CMI Marks 1 through 7 in its future content, and a disclaimer denying any relationship with Guthrie shall accompany any present use of CMI Marks 1 through 7 in its products already in commerce. This injunction shall apply only in the Guthrie Service Area, i.e., the Twin Tiers region of Northern Pennsylvania and Southern New York; the public is unlikely to be confused outside of that area. See Brennan's, 360 F.3d at 134 ("Although registration presumptively creates nationwide protection, the Lanham Act only

permits an injunction against a party where that party's use of a similar mark is likely to cause confusion.").

CMI requests that any injunction be limited to CMI's patient-facing content, because pharmaceutical companies, medical device companies, universities, and governmental agencies are highly sophisticated and careful, and can be easily informed through a "management plan" that Guthrie is not affiliated with CMI should any confusion arise. (See Defs.' Post-Trial Mem. 15, ECF No. 115 (citing Tr. 96:03–19).) Nonetheless, the Court finds that the likelihood of confusion due to the similarity of the marks and the other factors outlined above is sufficiently high to warrant that all of CMI's content be subject to this injunction.

CMI also argues that editing existing videos to add a disclaimer would be unduly burdensome. (See Defs.' Post-Trial Mem. 15–16 & n.86 (citing Tr. 208:03–213:18, 214:13–216:07).) This Court disagrees. Shah testified that such a process would require "significant expense" and be "difficult" but that it would be "possible"; furthermore, Shah stated that adding a disclaimer "would be certainly our preference" over eliminating the Mark from its content. (Tr. 209:11–13, 209:14–18, 213:04.) Additionally, Shah stated that altering limited areas of a video, rather than a video's backdrop, "could be done with relative ease," and testified that CMI had altered its videos beginning in 2012 in such a manner to superimpose its new ContextMedia health logo on existing content. (Tr. 213:11–15, 21:24–215:02.)

In light of this evidence, and after weighing both Guthrie's senior mark and the difficulty and expense of altering CMI's videos, the Court finds that the

34

appropriate result is, as set forth above, to add a disclaimer to existing content. The Court finds that a disclaimer would be adequate and appropriate to avoid the risk of consumer confusion. See, e.g., Home Box Office, 832 F.2d at 1315 ("We have found the use of disclaimers to be an adequate remedy when they are sufficient to avoid substantially the risk of consumer confusion."); see also Spring Mills, Inc. v. Ultracashmere House, Ltd., 724 F.2d 352, 355 (2d Cir. 1983).

The Court will maintain jurisdiction over this injunction for three years. During that time, if Guthrie becomes aware of actual consumer confusion notwithstanding this injunction, then it may apply for broader injunctive relief from this Court.

E.    The ContextMedia Health Mark (Counts Eight and Thirteen)

Based on the aforementioned discussion, the Court believes that there is no reason why it should not enter judgment in favor of Guthrie as to liability and injunctive relief with respect to CMI Mark 8 ("ContextMedia Health"), notwithstanding the somewhat different appearance of that mark. However, additional outstanding issues regarding this mark remain.

The Court's determinations on summary judgment regarding bad faith or intentional deception (see SJ Op. 15–18) do not apply to Mark 8, which CMI applied to register with the PTO after this lawsuit had commenced. Accordingly, given the possibility that CMI acted with bad faith or intentional deception with respect to this mark, Guthrie may be entitled not only to an injunction against the use of Mark 8, but may also be entitled to profits, damages, or attorneys' fees with respect to that mark. See George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir.

1992) (explaining the requirements for plaintiffs to recover profits or damages).[7]
Because unjust enrichment requires bad faith or willful infringement, Count
Thirteen of the complaint also survives, but only with respect to CMI Mark 8.

The Court shall entertain a motion by Guthrie for partial summary
judgment, or another appropriate motion, regarding liability, injunctive relief, and
monetary relief for Count Eight and Count Thirteen with respect to CMI Mark 8.
CMI shall then have an opportunity to respond to any such motion.

III.    CONCLUSION

For the reasons set forth above, the Court finds in favor of Guthrie as to
Counts One through Seven, Nine, and Ten.  However, the Court finds that Shah
cannot be held individually liable on those counts.

The parties shall confer on the wording of an injunction, the scope of which is
set forth above, and shall submit a joint proposed injunction and judgment to the
Court within 14 days, or by **Thursday, July 3, 2014**.

The parties shall also confer on a course of action to resolve Guthrie's claims
regarding CMI Mark 8, and shall submit a joint proposal no later than **Thursday,
July 3, 2014**.

---

[7] The Court notes that, despite the availability of monetary relief under the Lanham Act in such a
scenario, Guthrie may nevertheless be unable to demonstrate its entitlement to any such relief,
given its admission that it is not aware of any actual confusion.  (See SJ Op. 13–14.)

The Clerk of Court shall close the motion at ECF No. 85.

SO ORDERED.

Dated:    New York, New York
          June 20, 2014

_____
KATHERINE B. FORREST
United States District Judge